UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| **UNITED STATES OF AMERICA**, | CRIMINAL ACTION NO. |
| *Plaintiff,* | 6:18-cr-00168 |
| | & |
| v. | 7:18-cr-00849 |
| **DANA ROUSH**, | **SENTENCING MEMORANDUM** |
| *Defendant.* | |

Dana Roush has nothing in her background to suggest she would end up in front of this Court for sentencing on two fraud cases. This Court should rule in her favor on the filed objections and sentence her to a variance sentence of 60 months or less, which is just 10 months less than the bottom of her appropriately calculated advisory sentencing range.

Dana is 38 years old and grew up in Woodruff, South Carolina. She graduated from Woodruff High School and earned a tennis scholarship to Spartanburg Methodist where she earned an associate degree in Art. She earned a bachelor's degree from Converse College before managing a grocery store and eventually working at the post office.

Dana met her co-defendant Bubba Roush while working at the post office. She quickly fell under his spell and they were eventually married. Bubba had numerous businesses, which Dana often financed. He started several businesses involving remodeling and "flipping" real estate, which all failed. Dana worked and lived with her parents at the time, so she was able to finance these ventures. However, she did not work with Bubba until he started Kingdom Connected.

Shortly after their Dana and Bubba married, Bubba began working real estate deals with Tim McCormick, a Chattanooga real estate investor. None of these early deals

worked out financially and Bubba eventually struck out on his own.

Dana had no role in starting Kingdom Connected. Bubba asked her to become a notary to assist with paperwork. She performed small tasks for Bubba at his direction, including making signs, taking pictures, showing homes, and notarizing documents.

Bubba eventually met attorney Robert Pohl, who sold him on the idea of a real estate investment trust (REIT) that would make them millions. Dana never believed in Pohl's idea, suspecting he was selling a grandiose idea that had little chance of success.

Bubba, on the other hand, fell for Pohl's idea completely. Because he needed more money and properties, he began rapidly expanding the business. He spent large amounts of money and began buying properties at a reckless pace. The deals went from high risk to very high risk. Between these purchases and a large marketing budget, the company began coming up short on mortgage payments.

Bubba and Dana's marriage became strained as the business began failing and Dana ultimately left the company. She admits she did not leave before many of the illegal acts cited in the Government's case. However, she did not leave to escape criminal liability. She left because she was sincerely concerned about the actions of Kingdom Connected. While it was not in time to avoid punishment, it should mitigate in her favor.

## ADVISORY SENTENCING GUIDELINES

Dana has no criminal history. Her criminal history category is I.

There are two cases before the Court for sentencing: the case stemming from the Kingdom Connected real estate business (referred to in this memo as the "Kingdom Connected case") and the case stemming from Dana's position with the postal union (referred to in this memo as the "post office case").

The Kingdom Connected case has two counts. The conspiracy to commit mail fraud

has a starting offense level of 7. The loss amount is $2,674,886.51, resulting in a 16-level increase. Because the offense caused financial hardship to more than 5 victims, 4 more points are added. The base offense level for this count is 27.

Probation has recommended a 2-level enhancement for abuse of trust or use of a special skill in committing the offense and a 3-level enhancement for leadership role. The advisory adjusted offense level on Count 1 of the Kingdom Connected case is 32.

The equity skimming count uses the same loss amount to reach a base offense level of 22. The abuse of trust or special skill enhancement adds 2 levels, for an adjusted offense level of 24.

The post office case results in an adjusted offense level of 24. Under the grouping rules, the adjusted offense level from the Kingdom Connected case drives Dana's sentence. Counsel's objections will not change that relationship between the two sentences, so they focus on the Kingdom Connected case.

An adjusted offense level of 32 with a criminal history category I results in an advisory sentencing guidelines range of 121-151 months.

## **OBJECTIONS TO PSR**

### **Dana Roush was not a leader in this offense.**

The United States Probation Office advises an enhancement for Dana under §3B1.1(b): "[i]f the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels."

Dana Roush did not serve as a leader or organizer in this conspiracy. As explained below, there was no extensive criminal organization. The two criminally culpable participants in this matter were Dana and Bubba Roush. Even in the light most favorable

to the Government, Dana had no leadership role with regards to Bubba Roush. It was quite the opposite; Bubba was unquestionably the leader of the two conspirators. Because Dana had no leadership role in the conspiracy at the center of this case, no leadership enhancement is appropriate.

<u>There were not five or more participants in the offense for which Dana was convicted.</u>

The Government concedes in its sentencing memorandum there were not five or more criminally responsible participants. Defendant relies on this concession in offering no further argument on this prong of the enhancement.

<u>The offense in this case does not qualify as "otherwise extensive" as required by the advisory sentencing guidelines.</u>

The only criminally culpable participants in this case were Bubba and Dana Roush. In describing this as an extensive operation, the Government points out the total loss amount and the number of victims, neither of which support a leadership enhancement. It also points out various actions by Dana in the management of the business in support of the enhancement.

Dana must have had control over people to qualify for a leadership enhancement. Managing money and property is not enough to support an aggravating role. *United States v. Cameron,* 573 F.3d 179, 185 (4th Cir. 2009). None of the cited activities, which relate to management of the business finance or activities, support an aggravated role under *Cameron*.

The definition of "otherwise extensive" is unclear. In 2001, the District of Columbia Circuit recognized a circuit split on whether "otherwise extensive" was primarily based on the number of persons involved in the criminal activity or on the totality of the circumstances surrounding the activity. *United States v. Wilson,* 240 F.3d 39, 47 (D.C.

Cir. 2001).

Circuits relying primarily on the number of people involved follow the Second Circuit's opinion in *United States v. Carrozzella*. 105 F.3d 796, 802 (2nd Cir. 1997). By "head counting" the Second Circuit held it was carrying out the intent of the United States Sentencing Commission. *Id*. The Second Circuit noted many of the characteristics of an "extensive" organization are already punished in other guidelines.

The amount of loss, evidence of planning, and number of victims are all common enhancements in a fraud case. *Id*. Enhancements for abuse of trust, victim vulnerability, and role in the offense were all enhancements that could conceivably be related to the "extensiveness" of a conspiracy. *Carrozzella* held that the size of the organization in terms of persons being organized or led was the primary driver in a 3B1.1 enhancement.

The enhancement is intended to assign culpability among defendants depending on how big their operation was and the relative role of each defendant. *Id*. at 803. The guidelines advise that defendants in larger organizations are more likely to reoffend and more dangerous, while the delineated responsibility between actors in a less extensive organization is less important. *Id*.; U.S.S.G. §3B1.1, Background.

The Fourth Circuit looks at both the number of people involved in the scheme as well as the role those people played in analyzing whether activity was "otherwise extensive." In *United States v. Ellis*, the owner of a greyhound track in West Virginia was prosecuted on a variety of federal charges related to the corrupt passage of a bill related to racetrack owners keeping a larger percentage of wagers. *United States v. Ellis*, 951 F.2d 580, 582 (4th Cir. 1991).

Ellis's scheme involved a variety of fraudulent means, including paying cash to West Virginia legislators through a lobbyist. In finding the scheme extensive, the Fourth

Circuit held there were four major participants, but to carry out the scheme they used the services of numerous lobbyists, legislators, and their staffs. *Id.* at 585. With little discussion, the Fourth Circuit held the number of people involved were critical to the corrupt passage of the bill. *Id.* Even if they did not know their role in the corruption their participation qualified the scheme as extensive. *Id.*

In a later case involving conduct that was not found "otherwise extensive," the Fourth Circuit followed the same analysis of the number of people involved in the scheme and their contribution to it. *United States v. Ruhbayan* involved a scheme to obstruct justice. *United States v. Ruhbayan*, 406 F.3d 292, 295 (4th Cir. 2005). In a drugs and firearm case, Ruhbayan convinced his girlfriend to claim the gun, resulting in a partial acquittal at trial. *Id.* at 295-96.

At sentencing the district court found the scheme otherwise extensive based on the involvement of the defendant, the girlfriend-witness, the defendant's lawyer and staff, and the twelve jurors at the trial. *Id.* at 298. The district court did not find those people were all involved in the scheme, concluding they were not criminally responsible for the scheme but unwittingly assisted in its execution. *Id.*

The Fourth Circuit found the enhancement did not apply. While the jurors may have been key to the final objective of the scheme, they were objects of the scheme as opposed to advancing the scheme. *Id.* at 302-3. The Fourth Circuit did not address the others in its finding, suggesting that a small number of unwitting participants was not enough for the enhancement.

Both *Ellis* and *Ruhbayan* support Dana's objection and require this Court to decline to apply this enhancement. None of the activities cited by the Government can support an extensiveness finding; the number of participants is the starting point. The

Government cites seven people who worked at Kingdom Connected during the conspiracy.

It is unlikely 7 participants could ever support a finding of extensiveness. If it could, the guidelines would simply advise the enhancement when there were more than five participants, whether they were criminally culpable or unwittingly advanced the scheme.

## Dana Roush neither abused a position of trust nor used a special skill in this offense.

The PSR advises an enhancement under U.S.S.G. §3B1.3 based on Dana Roush "portraying to customers and potential customers that she had the proper licenses and training to assist with the purchasing and selling of real estate." (PSR ¶108). The Government takes a slightly different tack, arguing it was her position as owner and member of the company that gave her a position of trust.

Under either theory, the enhancement is improper and should not be applied. Dana did not hold herself out as a real estate agent and her ownership of the company or status as a member of the LLC did not place her in a position of trust. Factually and legally, this enhancement does not apply.

The Government cites two cases in support of its argument Dana was in a position of trust solely based on her position as a partner in Kingdom Connected, LLC. Both are distinguishable from this case.

*United States v. Miller* is an unpublished opinion from the District of Columbia Circuit.[1] 1996 U.S.App. LEXIS 30356 (D.C. Cir. 1996). The facts are not fully discussed

---

[1] The published cite appears to be a table cite, but the actual opinion is unpublished. Defendant uses its Lexis cite in this memorandum.

in the appellate opinion, but the district court opinion reflects the case involved a partner in a real estate venture stealing from his other partners. *United States v. Miller*, 901 F.Supp. 371 (D.D.C. September 14, 1995). Miller was in a position to commit his crimes based on the trust his partners placed in him because of his position within the company.

The Fourth Circuit, consistent with the D.C. Circuit and the advisory sentencing guidelines, applies this enhancement when the defendant occupied a position of trust and the position of trust contributed in some significant way to facilitating the crime. *United States v. Moore,* 29 F.3d 175, 179 (4th Cir. 1994); *United States v. West,* 56 F.3d 216, 219 (D.C. Cir. 1995); U.S.S.G. §3B1.3, n.1.

In *Moore*, the Fourth Circuit explained the question of whether a defendant is in a position of trust is viewed from the perspective of the victim. *Moore,* 29 F.3d at 179-80. Ordinary commercial relationships do not support the application of this enhancement. *Id.* at 180.

The Eighth Circuit case cited by the Government is similarly distinguishable. In *United States v. O'Hagan*, O'Hagan was a senior partner at a law firm specializing in securities law. *United States v. O'Hagan,* 139 F.3d 641, 644 (8th Cir. 1998). He made over 4 million dollars purchasing shares in a company after gaining material, nonpublic information from one of his law partners involved in a takeover of the company. *Id.* at 648. The Eighth Circuit specifically held O'Hagan owed both his law firm and the client of his las firm a duty of trust and confidentiality that was breached when he used confidential client information for his own benefit. *Id.* at 649.

Like *Miller*, *O'Hagan* involved someone who was able to use their position to both commit and, at least for a time, conceal the crime. These cases do not stand for the wholesale proposition that any partner in a business is automatically subject to an abuse

of trust enhancement. Rather, they are consistent with the advisory guidelines in holding that the position of trust contributed to the ability to contribute to the crime.

Dana was a partner in an LLC, but her position was simply a businesswoman. The Government has convicted her of fraud, but the fraud related to commercial transactions that cannot support this enhancement. *Akinkoye* supports this argument.

In *United States v. Akinkoye*, the abuse of trust enhancement was applied to a real estate agent. *United States v. Akinkoye*, 185 F.3d 192 (4th Cir. 1999). The Fourth Circuit was clear the enhancement does not turn on a job title. *Id.* at 203. Dana disputes she ever held herself out as a real estate agent, but even if she had, the enhancement would turn on more than that.

The Fourth Circuit considers several factors for this enhancement, including: (1) whether the defendant has special duties or access to information not available to other employees; (2) the defendant's discretion; (3) whether the defendant is more culpable than similarly situated defendants; and (4) the victim's perspective. *Id.* Akinkoye's sentence was enhanced not because he was a real estate agent but because he used that position to gain access to confidential information he used to commit his crimes.

Dana did not have any particular position of trust or inside information that allowed her to commit these crimes. While the case involves a fraud conviction, the fraud stemmed from a commercial transaction. The enhancement for abuse of trust should not apply in this case.

## <u>18 USC 3553(a) FACTORS</u>

**<u>Nature and circumstances of the offense and history and characteristics of the Defendant</u>**

1.    <u>Nature and circumstances of the offense</u>

This Court is familiar with the nature of this offense. It is tragic and caused great harm. However, the correct advisory guidelines (without the enhancement addressed earlier) contemplate this fraud and create an appropriate starting point for Dana's sentence.

Even if the Court rules in favor of Dana's objections, her advisory sentencing range accounts for the amount of loss, the number of victims, and the effect the crime had on those victims. An appropriate starting point in this case is the advisory total offense level of 27, resulting in a recommended custody sentence of 70-87 months.

The correct advisory guidelines range appropriately considers all factors involved in this fraud and serves as the correct starting point in this case.

2.    <u>History and Characteristics of the Defendant</u>

Dana has no criminal record. She has a teenage daughter she has raised largely on her own. She has a strong relationship with her family and her Christian faith. While the cases in front of the Court reflect her worst decisions on her worst days, they do not reflect her as a whole. Dana has a history of hard work and integrity. That history and the support of family and friends suggests she can redeem herself after serving this sentence.

3.    <u>Respect for the law</u>

To promote respect for the law, a sentence of incarceration must consider the defendant's actual conduct. The United States Supreme Court has approved a district court's recognition that "a sentence of imprisonment may work to promote not respect,

but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing." *Gall v. United States,* 552 U.S. 38, 54 (2007).

   4.    Just punishment

All federal sentences start with the goal of being sufficient but not greater than necessary. Dana has never been in trouble with the law. She has now been in jail for over a year and still faces additional prison time, even if the Court is merciful.

The requested sentence in this matter is just and not greater than necessary to punish Dana for her conduct.

## To afford adequate deterrence to criminal conduct

Any sentence of imprisonment in this case serves both general and specific deterrence. Dana has learned her actions have severe consequences. This case caused widespread suffering. Relative to many other white collar cases, Dana will face a harsh prison sentence and that sends a message both to her and the public.

## To protect the public from further crimes of the Defendant

Dana has no criminal history and there is nothing in her past to suggest she would reoffend after serving, no matter what this Court ultimately decides, will be a lengthy prison sentence. Both her lack of criminal history and her age suggest she will have little risk of recidivism and this factor does not weigh in support of a lengthy prison sentence.

## Need for educational/vocational training, medical care, or other corrective treatment

Dana is talented, well-educated, and has been successful in prior jobs. She does not require training or other care. However, she intends to take advantage of any training or education available in the federal prison system to better herself and improve her job

opportunities upon release from prison.

## **CONCLUSION**

A sentence of 60 months or less is appropriate in this case.

Respectfully Submitted,

**_s/ Joshua Snow Kendrick_**
Joshua Snow Kendrick (Fed ID 9037)
KENDRICK & LEONARD, P.C.
506 Pettigru Street (29601)
P.O. Box 6938
Greenville, SC 29606
Tel: (864) 760-4000
Josh@KendrickLeonard.com

Greenville, South Carolina